AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>SUBJECT FACEBOOK ACCOUNT:<br>User ID: 100008355545905<br>Vanity Name: travis.navarro.948 | )<br>)<br>)<br>)<br>)<br>)    Case No.    MJ22-455 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, attached hereto and incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1153 | Offense Committed Within Indian Country |
| 18 U.S.C. § 2243 | Sexual Abuse of a Minor |

The application is based on these facts:

✓   See Affidavit of FBI Special Agent Heidi Hawkins, continued on the attached sheet.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

---

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Applicant's signature*

Special Agent Heidi Hawkins (FBI)

*Printed name and title*

◉ The foregoing affidavit was sworn to before me and signed in my presence, or
○ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: ___9/22/2022___

*Judge's signature*

City and state: ___Bellingham, Washington___     Paula L. McCandlis, U.S. Magistrate Judge

*Printed name and title*

USAO: 2021R00122

1

**AFFIDAVIT**

2

STATE OF WASHINGTON     )

3
                                  )       ss

4

COUNTY OF KING               )

_____)

5

6

       I, Heidi Hawkins, a Special Agent ("SA") with the Federal Bureau of Investigation

7

("FBI"), having been duly sworn, state as follows:

8

## I. INTRODUCTION AND AFFIANT BACKGROUND

9

       1.     I am a Special Agent of the Federal Bureau of Investigation (FBI) where I

10

have been employed since October 2019. I am an investigative officer, or law

11

enforcement officer, of the United States of America within the meaning of Title 18,

12

United States Code (U.S.C.), Section 2510(7), that is an officer of the United States who

13

is empowered by law to conduct investigation of, and make arrests for, offenses

14

enumerated in Title 18. In the course of my duties as a Special Agent, I have investigated

15

criminal violations related to Indian Country crimes, as explained in 18 U.S.C. § 1151

16

and as it pertains to the Major Crimes Act (MCA). Further, I have investigated violent

17

crimes, drug offenses, and child abuse crimes.

18

       2.     The facts set forth in this Affidavit are based on my own personal

19

knowledge; knowledge obtained from other individuals during my participation in this

20

investigation, including other law enforcement officers; review of documents and records

21

related to this investigation; communications with others who have personal knowledge

22

of the events and circumstances described herein; and information gained through my

23

training and experience

24

       3.     I am investigating allegations that Travis Navarro (NAVARRO) committed

25

the crime of aggravated sexual abuse on or about November 10, 2020, in violation of

26

Title 18, U.S.C, Sections 1153 and 2241(a), which collectively make it a federal crime

27

AFFIDAVIT OF SA HEIDI M. HAWKIN - 1
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  for an Indian in Indian Country to knowingly cause another person to engage in a sexual

2  act by using force against that other person or threatening or placing that other person in

3  fear that they will be subjected to death, serious bodily injury, or kidnapping.  I am also

4  investigating whether NAVARRO committed the crime of sexual abuse of a minor on or

5  about November 10, 2020, in violation of Title 18, U.S.C., Sections 1153 and 2243(a),

6  which collectively make it a federal crime for an Indian in Indian Country to knowingly

7  engage in a sexual act with another person who at the time of the sexual act was at least

8  twelve years old, but not yet sixteen years old, where the other person is at least four

9  years younger than the person so engaging.

10      4.    On April 20, 2021, the Honorable Magistrate Judge Paula L. McCandlis

11 authorized Search Warrant MJ21-234, which ordered Facebook to produce the Facebook

12 Account of User ID 100008355545905, Account/Username Travis Navarro, and the

13 Facebook Account of victim Jane Doe. I make this Affidavit in support of an application

14 for a supplemental warrant to review information associated with the responsive search

15 warrant material provided by Facebook pursuant to MJ21-234 concerning Facebook User

16 ID 100008355545905, Account/Username Travis Navarro (the "FACEBOOK

17 ACCOUNT"), as more fully described in Attachment A, that is stored on an FBI

18 database.

19      5.    The facts set forth in this Affidavit are based on my own personal

20 knowledge; knowledge obtained from other individuals during my participation in this

21 investigation, including other law enforcement officers; review of documents and records

22 related to this investigation; communications with others who have personal knowledge

23 of the events and circumstances described herein; and information gained through my

24 training and experience.

25      6.    Because this Affidavit is submitted for the limited purpose of establishing

26 probable cause in support of the application for a search warrant, it does not set forth

27 each and every fact that I or others have learned during the course of this investigation

AFFIDAVIT OF SA HEIDI M. HAWKIN - 2
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

7.     This warrant and affidavit are being presented electronically pursuant to Federal Rules of Criminal Procedure Rule 4.1.

## II.  SUMMARY OF INVESTIGATION

8.     The information provided in paragraphs 8-36 below was included in the affidavit previously provided to Magistrate Judge McCandlis in support of the search warrant issued on April 20, 2021.

9.     At approximately 6:05 p.m. on November 10, 2020, the mother and step-father of a thirteen-year-old girl (Jane Doe) went in-person to the Sauk-Suiattle Police Department to report that after returning home from a quick trip to town they had discovered their other children still in the home, but Jane Doe was missing.

10.     Jane Doe's parents told the officer on duty that they suspected Doe's biological father may have picked her up, but a little over an hour later the officer learned that Doe's parents had subsequently confirmed that Doe was not with her biological father.

11.     The Sauk-Suiattle officer learned the identity of a close friend of Doe's from their school and an employee of the school spoke to Doe's friend, who reported that Doe had told her she was going to the house of a person named Travis that day.  The friend also reported that Doe met Travis on Facebook and that Travis lives somewhere near the Sauk-Suiattle Reservation.

12.     The Sauk-Suiattle officer asked Doe's parents if they knew anybody by the name of Travis.  Doe's step-father told the officer that the only Travis he knew was TRAVIS NAVARRO, who lived four houses away from their family.  Doe's step-father also said that before they contacted the police he had knocked on NAVARRO's door looking for Doe and that it took NAVARRO a minute or two to respond.  Doe's step-father also reported that all of the lights in the residence were off and that it seemed a little weird.  When asked if he had seen Doe, NAVARRO told Doe's step-father that he had not seen her.  After learning this information the officer went to NAVARRO's

AFFIDAVIT OF SA HEIDI M. HAWKIN - 3
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  residence and knocked on the door, but he did not hear any movement inside and nobody
2  responded.

3        13.    A short time later, Doe's mother called the officer and said that she had
4  reached out to Doe's friend herself, and Doe's friend told her that (1) Doe said Travis
5  was her boyfriend, and (2) she thought Travis' last name was Avarro or Navarro.

6        14.    Through the use of law enforcement databases, the officer was able to
7  identify an enrolled Sauk-Suiattle tribal member by the name of TRAVIS J.A.
8  NAVARRO who at the time was twenty-seven years old.

9        15.    At approximately 10:10 p.m., while the officer was working on a report,
10  Doe's step-father arrived back at the Sauk-Suiattle Police Department and reported that
11  while he was walking around outside calling Doe's name, Doe had walked into their
12  house and was sitting in a chair in the living room when he came in the door.  Doe's step-
13  father said that he had asked her, "where is he?" and Doe responded, "the creek."  The
14  officer understood this to mean an area approximately 200 feet away from NAVARRO's
15  residence.  Doe's step-father also reported that Doe had later whispered to him that, "I
16  think he raped me."

17        16.    The officer returned to Doe's home and spoke to Doe.  He asked Doe what
18  she had whispered to her step-father, and Doe said, "I think he raped me."  Doe also said
19  that "he" was TRAVIS NAVARRO and that it happened in the creek or possibly in the
20  cabin.  The officer was aware that NAVARRO's residence is frequently referred to as
21  "the cabin."  Doe also told the officer that it takes approximately 50 seconds to walk from
22  the creek to the cabin, and that she was still wearing the same clothes and had not
23  showered.  I have confirmed that both the cabin, the relevant portion of the creek, and the
24  surrounding area is located within the exterior boundaries of the Sauk-Suiattle
25  Reservation.

26        17.    Early the next morning, Doe gave a written statement in which she said that
27  the prior evening she was chasing after her dog when everything went black.  She

AFFIDAVIT OF SA HEIDI M. HAWKIN - 4
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

reported seeing a person who was 5'7 or taller, Native American, and "similar to 'Travis Navarro.'"  Doe wrote that she woke up in the woods behind a bush and that she had a loss of feeling in her thighs with "to much blood in between."  She also reported that she could hear her step-father calling her name and that as soon as she was able she ran out of the creek and to a neighbor who told her that her parents were looking for her and that she should go to her house.

18.    On November 11, 2020, Doe had a forensic examination at the Providence Intervention Center for Assault and Abuse in Everett, Washington. Doe reported the following to the sexual assault nurse examiner (SANE):

> I was taking my dog for a walk and I lost the leash.  I was running and chasing her down the road.  I heard something behind me and I kind of saw Travis out of the side of my vision and then everything went black.  I woke up inside the woods behind the creek.  I could hear my dad calling me, but I could not call back.  As soon as I could stand, I walked to my cousin's house.  As soon as I got close, my stomach felt loose and I just collapsed. My skin was cold a lot and then everyone was around me, maybe a few people and I was in my front yard.  When I woke up my thighs hurt really bad and there was a lot more blood than usual, and everything down there hurt.  I am on my period right now, but it was light and then after there was a lot.

19.    During the SANE examination, Doe identified NAVARRO as a neighbor she had known for approximately six months after meeting him when her step-father was in the hospital and NAVARRO helped take care of them.  She said she recognized her assailant as NAVARRO because of his bright brown hair.

20.    Doe's medical records from the SANE examination show that the medical provider documented discoloration, lesions, and swelling on her forehead, as well as bruising and abrasions on her back, arms, thigh, hip, ankle, knee, and abdomen.  The

AFFIDAVIT OF SA HEIDI M. HAWKIN - 5
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

injury to Doe's forehead was described as a 3cm x 6 cm area of swelling with approximately .7 cm to 1.2 cm of circular brown discolorations and approximately 2 mm round, red lesions to her forehead near the hairline.

21.     The SANE nurse collected numerous swabs from Doe's body and collected her clothing and some personal items.  The medical records note that much of the clothing was wet and stained with menstrual blood.  Both the swabs and the clothing were provided to law enforcement and sent to the FBI laboratory for testing.

22.     On November 17, 2020, a Child Interview Specialist interviewed Doe at Dawson's Place Advocacy Center in Everett, Washington.  The interview was recorded and I have reviewed the recording.  Doe told the interviewer that she knows NAVARRO from Fourth of July events when he helped with the food at their house, from being friends with kids who are his relatives, and from living on the same street.  Doe also told the interviewer that on the day in question she was walking her dog when the leash slipped out of her hand.  As she was pursuing the dog, and after she saw him off to the side, NAVARRO struck her in the forehead with an object that she thinks may have been a rock, and then everything went black.  Doe said that she recalls being carried or dragged into the woods, but it was blurry, and that when she woke up her legs were hurting and she had scuff marks/bruising on her ankles.

23.     Doe explained to the Child Interview Specialist that when she first woke up she tried to get up, but somebody she thinks was NAVARRO (based on the brightness and color of his hair) pushed her back down.  She was unable to move.  Doe also said that she remembered hearing her step-father calling for her when she first regained consciousness and that she saw the light from his flashlight, and that NAVARRO then ran away.  She said she ran to a neighbor's house for help and the neighbor called her mom.  Doe reported that "he attacked me" and said, "I remember being raped by him." Doe was emotional when asked what she specifically remembered about the rape, and said that a rape is a "sexual assault," being forced to do something you don't want to do.

AFFIDAVIT OF SA HEIDI M. HAWKIN - 6
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    She said it was something she was not ready to do until she got older.  Doe also said that
2    she recalled NAVARRO being on top of her and that when she woke up her pants and
3    bra strap were out of place, and her body "from the waist down was hurting."  She
4    reported that she was unable to shove him off of her.  When asked what body parts of
5    NAVARRO were touching her and what body parts were involved, Doe said it was hard
6    to talk about, and that it involved body parts from the waist down to the thighs.  Doe said
7    she does have some memories from the sexual assault, but it was too hard to discuss.
8    Doe also said she could feel that she was bleeding heavily, with much more blood than is
9    normal from her period.  Doe said that the only thing NAVARRO said to her that night
10   was that if she told anybody what happened, her whole family would be dead.

11          24.     When asked by the Child Interview Specialist if she had talked to
12   NAVARRO before, Doe said that she had hung out with him in the past, but it always
13   made her feel uncomfortable.  NAVARRO would approach her when she was walking
14   her dog and they would walk around the reservation together while talking.  She said they
15   walked together once or twice a month, but he had never talked about wanting to do
16   anything else with her.  Doe also said that at some point she had a small crush on him,
17   but she had no intention of doing anything with him.  She did not think he felt the same
18   way about her.  Doe also said that she and NAVARRO used Facebook messenger to
19   communicate with her around once or twice a month, but she did not think they were
20   "friends" on Facebook.

21          25.     On December 10, 2020, a special agent of the FBI interviewed Doe's
22   neighbor about the events of November 10, 2020.  The neighbor recalled that Doe's step-
23   father had come to his residence looking for Doe and had asked if he'd seen NAVARRO.
24   The neighbor said he had not and reviewed footage captured from his Ring doorbell to
25   see if it had recorded Doe's whereabouts during the relevant time period.  Although the
26   neighbor found one video of Doe from earlier in the day, he and her step-father
27   confirmed that it was taken prior to the time Doe went missing.  The neighbor also

AFFIDAVIT OF SA HEIDI M. HAWKIN - 7
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

reported that he himself had then gone to NAVARRO's apartment to ask about Doe, and
NAVARRO told him that he had not seen her.  The neighbor further reported that later
that evening, around 10:00 p.m., he was lying in bed when the doorbell alert on his phone
went off several times and he could see on his phone that Doe was at the front door.  The
neighbor said that he answered the door and Doe told him she needed help and did not
know what was happening.   The neighbor said that he did not see any visible injuries on
Doe, but she was disheveled and had a piece of straw or grass in her hair.  The neighbor
said he helped Doe walk back towards her house and returned to his own home to call her
parents.  While talking on the phone, the neighbor observed Doe collapse in her front
yard and begin to have seizure-like convulsions.  The neighbor then went back outside
and helped Doe into her house.

26.     On December 10, 2020, a Special Agent of the FBI also interviewed Doe's
step-father about the events of November 10, 2020.  In addition to what he had
previously told law enforcement, Doe's step-father reported that when he first saw Doe
after she returned to the house, she told him that she had been playing in a nearby field
and that the details were "a blur."  Doe's step-father also reported that he had learned
from Doe that NAVARRO had threatened to kill their family if she told anybody about
the rape.  Doe's step-father said he suspected that Doe had been speaking to NAVARRO
online or meeting up with him in the weeks leading up to the rape, possibly while out
walking the dog.  He said he had previously found a note in Doe's pocket that said, "I
love you, but can't get out."  Doe's step-father said that he had tried to ask her about the
note, but she said it was part of a game and did not explain further.  He also said that after
the assault he had accessed Doe's Facebook account and saw messages between Doe and
NAVARRO, and that he had spoken to some of Doe's friends about her relationship with
NAVARRO.  Doe's step-father believed Doe probably "has some feelings" for
NAVARRO.

AFFIDAVIT OF SA HEIDI M. HAWKIN - 8
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

27.     On December 10, 2020, a Special Agent of the FBI also interviewed Doe's mother about the events of November 10, 2020.  In addition to what she had previously told law enforcement, Doe's mother described Doe having seizure-like convulsions in their yard after the attack.  Doe's mother explained that this had happened before and that medical providers had determined the convulsions were related to panic attacks.  Doe's mother described the bruising she observed on Doe's forehead as from being hit by a rock.  Doe's mother said she had overheard Doe tell her step-father that NAVARRO threatened to hurt Doe or her family if she told anybody about their relationship.  Doe's mother said that Doe was having nightmares about NAVARRO murdering their family. Doe's mother said that she believes Doe was being protective of NAVARRO when she answered questions at the hospital.  Doe's mother also said that she knew Doe had characterized NAVARRO as the "love of her life" on social media.

28.     On March 10, 2021, FBI Special Agent Sara Blond interviewed Doe.  I have listened to the audio recording of the interview.  During the interview, Doe explained that she met NAVARRO through his cousins and because NAVARRO helped out on or around the 4th of July in 2020 when her step-father got injured.  After the 4th of July, Doe saw NAVARRO outside and around the neighborhood on a few occasions in July.  He later started coming around a lot more.  Doe explained that NAVARRO started complimenting her a lot and called her beautiful and sexy.

29.     Doe described a time when NAVARRO approached her and touched her butt and another part of her body when she was outside walking her dog.  NAVARRO approached her and groped her on this occasion.  Because Doe was uncomfortable using certain words for body parts, Doe used alternative words that she and her friends use as code words for body parts.  Doe said that the other body part NAVARRO touched a few days before Veteran's Day was her vagina, although she used the code word to describe the body part.  Doe explained that on this occasion NAVARRO had touched her over her clothes.  Doe said she told him not to do that and walked away.  According to Doe,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

NAVARRO got mad at her and tried to hit her, although his attempt was not successful.
Doe said NAVARRO later sent her messages through Facebook Messenger (they had
previously communicated through Facebook Messenger and she had already accepted his
request to be "friends" on Facebook).  Doe first described this incident as happening
shortly before Veteran's Day, but later in the interview clarified that it occurred in
August.

30.     Doe recounted a time in November 2020, before the sexual assault later in
the month, when NAVARRO followed her when she walked to the smoke shop.  He
stopped her and she felt uncomfortable when he tried to get closer to her.  Doe said that
NAVARRO leaned in to kiss her and she walked away and told him she needed to go
home.

31.     Doe explained that her friends knew she had a little crush on NAVARRO
during this time period, but she did not know they were dating until he said so.  He
always said "I love you," but she thought he was saying it as family because they have
the same cousins.

32.     Doe further explained that on the day of the sexual assault she was still
upset with NAVARRO for the prior incident.  She stayed home that day watching
television.  Over the course of the day, NAVARRO walked around outside her house and
he stared at her from inside his house when she walked by.  Doe thought he was trying to
get her attention, but she did not pay attention to him.  Doe explained that at some point
in the day, NAVARRO went fishing and sent her messages and pictures from his fishing
trip.  Around 5:00 p.m., Doe decided to take her dog for a walk.  She walked past
NAVARRO's house and he came outside and started following her.  Doe said that her
dog ran off and she was in the field behind the daycare.  He asked her to come with him
and she said no.  Doe explained that NAVARRO tried hitting her, including with a rock.
He swung at her with the rock in his hand and made contact with her head.  Doe
explained that she was knocked to the ground, after which NAVARRO pulled her up and

1 tried to get her to walk to "the cabins."  He grabbed her arm and started walking to the

2 creek, and then he brought her into his house (which she called "the cabin").  Doe

3 described that there is one room in the cabin.  Once inside, NAVARRO hit her with his

4 fists.  She felt sleepy and could not see because it was dark outside.  At one point when

5 NAVARRO was sexually assaulting her, she heard a knock on the door.  NAVARRO

6 opened the door, but she could not hear who he was talking to.  She tried to move, but felt

7 like she couldn't do so and also couldn't make noises.  Doe described that it felt like there

8 was something holding her down.

9    33.   When asked what she meant when she said NAVARRO was sexually

10 assaulting her, Doe was emotional and had a hard time describing what happened.  She

11 said that NAVARRO pulled off her shirt, bra, underwear, and pants while she was on a

12 futon in the cabin.  Doe did not remember what happened with NAVARRO's clothes.

13 She described the sexual assault as a "rape," and used code words to describe that

14 NAVARRO used his penis to touch her vagina by putting it inside.  Doe also used code

15 works to describe that NAVARRO used his hands to touch her breasts during the assault.

16 During the interview, Doe used a diagram of the human body to explain her body part

17 code words to Special Agent Blond.  Doe said that NAVARRO did not say anything

18 during the sexual assault, but he kept hitting her with his hands.

19    34.   Doe explained that NAVARRO stopped sexually assaulting her when he

20 answered the door.  He put his clothes on before going to the door.  Doe said that the

21 door was open briefly and the person who knocked did not come inside.  After the door

22 closed, NAVARRO continued sexually assaulting her for what Doe believed was about

23 thirty minutes.  After the assault, Doe still felt unable to move.  She felt sick.

24 NAVARRO got her dressed and put her clothes back on.  Once she was dressed,

25 NAVARRO tried to get her to walk.  When they were outside of the cabin walking

26 towards her house, Doe collapsed.  Doe said that she thinks she recalls NAVARRO

27 saying that he might get caught.  He pushed her down and she heard a loud noise, after

AFFIDAVIT OF SA HEIDI M. HAWKIN - 11
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  which her head hurt.  He dragged her body by her ankles, causing bruises, and then she

2  heard him running away.  Doe said she also recalls hearing her step-father calling her

3  name.  She got up and went to her neighbor's house.  Doe said she did not remember if

4  NAVARRO wore a condom during the sexual assault.

5      35.    Finally, Doe also explained to Special Agent Blond that it took her some

6  time to be open and truthful about what happened because it took her a while to trust

7  somebody enough to do so.

8      36.    I have reviewed a Certificate of Indian Blood for NAVARRO from the

9  Sauk-Suiattle Tribe, which shows that NAVARRO is an enrolled member of the Sauk-

10 Suiattle Tribe with a 1/4 quantum of Indian Blood.  The Sauk-Suiattle Tribe is a federally

11 recognized Indian tribe.

12     37.    Using open source searches, another agent has identified a Facebook

13 account with vanity name Travis.Navarro.948.  Although the account is private and the

14 agent could not see everything posted on the user's page, publicly available pictures

15 associated with this account match NAVARRO's DOL photograph.  The Facebook ID

16 for the account is 100008355545905 and the user/display name for the account is Travis

17 Navarro.

18     38.    As noted above, On April 20, 2021, the Honorable Magistrate Judge Paula

19 McCandlis authorized a search warrant for both NAVARRO and the victim Jane Doe's

20 Facebook accounts.  Facebook subsequently provided the records covered by the warrant.

21 The prior case agent who has since retired, SA Doak Mahlik, conducted a review of the

22 records and seized 21 pages out of the 8,000 plus page return pertaining to NAVARRO's

23 Facebook account. It appears, however, that SA Mahlik did not review certain portions of

24 the information provided by Facebook from these accounts.  As detailed in the affidavit

25 provided to Judge McCandlis on April 21, 2021, the government believes information in

26 the account will provide relevant information about the relationship between Doe and

27 NAVARRO, their past interactions and communications, and/or the events surrounding

AFFIDAVIT OF SA HEIDI M. HAWKIN - 12
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    what occurred on November 10, 2020. I am therefor requesting authority to re-review the

2    entirety of the records. I am not seeking to review any documents beyond what was

3    produced by Facebook in response to Search Warrant MJ21-234.  During my review I

4    will identify the portion of the records that are relevant to my investigation and will seize

5    only the documents that meet the criteria set forth in Attachment B.

6         39.    In addition to the 21 pages seized initially by SA Mahlik, the defense

7    requested and received from the government a complete copy of NAVARRO's Facebook

8    account.

9                          III.  **CONCLUSION**

10        40.    Based on the foregoing, I believe there is probable cause that evidence,

11   fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1153

12   and 2241(a) and 2243(a) is located in the FACEBOOK ACCOUNT as more fully

13   described in Attachment A to this Affidavit.  I therefore request that the Court issue a

14   warrant authorizing a search of the FACEBOOK ACCOUNT for the information set

15   forth in section I of Attachment B of this Affidavit, and the seizure of the content more

16   fully described in Section II of Attachment B hereto, incorporated herein by reference of

17   any such items found therein.

18                                    _HEIDI M. HAWKINS, Affiant_

19                                    Special Agent, FBI

20

21        The above-named agent provided a sworn statement attesting to the truth of the

22   foregoing affidavit by telephone on the 22nd day of September 2022.

23

24

25

26                                    HON. PAULA L. MCCANDLIS

27                                    United States Magistrate Judge

AFFIDAVIT OF SA HEIDI M. HAWKIN - 13            UNITED STATES ATTORNEY
USAO #2021R00122                                700 STEWART STREET, SUITE 5220
                                                SEATTLE, WASHINGTON 98101
                                                (206) 553-7970

## ATTACHMENT A

### DESCRIPTION OF LOCATION TO BE SEARCHED

This warrant applies to information associated with the following Facebook account:

FACEBOOK ACCOUNT
Display Name: Travis Navarro
Vanity Name: travis.navarro.948
User ID#: 100008355545905

The original search warrant return from Facebook is stored on FBI servers.

For NAVARRO's account, the warrant is limited to the above-referenced information for the time period from July 1, 2020, through the date the initial search warrant authorized: April 20, 2021.

ATTACHMENT A - 1
USAO #2021R00122

**ATTACHMENT B**

**Particular Things to be Seized**

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of the FBI pursuant to the original search warrant executed upon Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the government will review the materials Facebook previously disclosed concerning the following information to the government for the user ID listed in Attachment A:

(a)      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)      All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, including the Friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

ATTACHMENT B - 1
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(e)   All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)   All "check ins" and other location information;

(g)   All IP logs, including all records of the IP addresses that logged into the account;

(h)   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)   All information about the Facebook pages that the account is or was a "fan" of;

(j)   All past and present lists of friends created by the account;

(k)   All records of Facebook searches performed by the account;

(l)   All information about the user's access and use of Facebook Marketplace;

(m)  The types of service utilized by the user;

(n)   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**II.   Information to be seized by the government.**

The following information described above in Section I that relates to the ongoing investigation involving Travis Navarro, for the account identified on Attachment A:

(a)   Any content including e-mails, messages, texts, photographs, visual images, documents, spreadsheets, address lists, contact lists or

ATTACHMENT B - 2
USAO #2021R00122

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

communications of any type that identify the user, and his location at any time between July 1, 2020, and April 20, 2021.

(b)     All records relating to who created and used the user ID, and all records identifying any person with whom the user has been in contact between July 1, 2020, and April 20, 2021.

(c)     All subscriber records associated with the specified account, including name, address, local and long distance telephone connection records, records of session times and durations, length of service (including start date) and types of service utilized, telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address, and means and source of payment for such service including any credit card or bank account number.

(d)     Any and all other log records, including IP address captures, associated with the specified account.

(e)     Any records of communications between Facebook and any person about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users about the specified account.  This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970